Filed 6/30/14  P. v. Gaines CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VEOLA ASALEANIA GAINES,<br><br>        Defendant and Appellant. | A136290<br><br>(Contra Costa County<br>Super. Ct. No. 05-091305-3)<br><br> ORDER MODIFYING OPINION<br> AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on May 29, 2014, be modified as follows:

1.  On page 22, first full paragraph, delete the second sentence, which begins, "First, defendant failed to preserve her objection . . . . ," then delete the next sentence of that paragraph which begins "Second, while defendant's fallback position . . . ." and replace it with the following sentence:

> It was defendant's burden on this appeal to demonstrate there was another residency definition more applicable to the facts of this case under which a rational jury could have found there was a reasonable doubt about whether she was a resident of Contra Costa County for purposes of the IHSS program during the relevant time period.

2.  On page 23, after the first full paragraph that ends with the sentence "She fails to carry that burden," and before section II.D. insert the following paragraph:

> In a rehearing petition, defendant calls our attention to a special definition of the term "own home" found in a manual prepared by the California Department of Social Services.  The manual defines "own home" as "the

place in which an individual chooses to reside" for purposes of distinguishing between those eligible to receive IHSS services and persons who live in "out-of-home care facilities" and are ineligible under the program. (Cal. Dept. of Social Services Manual of Policies and Procedures, reg. 30-701(o)(1)–(2).) This definition sheds no light on how to determine the county in which the recipient resides. Other regulations in the manual make it clear that the county responsible for paying benefits under the program is the county in which the recipient "make[s] his/her home," and that the recipient is "responsible for . . . [¶] . . . [¶] . . . [r]eporting within 10 calendar days when a *change of residence* places the recipient within the jurisdiction of another county." (See Cal. Dept. of Social Services Manual of Policies and Procedures, regs. 30-701(i), 30-760.17, italics added.) In our view, the regulations and statute contemplate that a residence is a place the recipient intends to make his or her home, a recipient can have only one residence, and that residence must be located in the county providing the services. The instruction given embodies these requirements, and nothing in the regulatory definition of "own home" contradicts them.

There is no change in the judgment.

The petition for rehearing is denied.

Dated:

_____
Margulies, Acting P.J.

2

Filed 5/29/14  P. v. Gaines CA1/1 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VEOLA ASALEANIA GAINES,<br><br>        Defendant and Appellant. | A136290<br><br>(Contra Costa County<br>Super. Ct. No. 05-091305-3) |

A jury convicted Veola Asaleania Gaines of grand theft arising from her application for and receipt of public assistance benefits from Contra Costa County while she was receiving a Section 8 housing subsidy for a residence in Alameda County. Defendant contends the judgment must be reversed due to the prosecutor's improper use of a peremptory challenge against an African-American prospective juror, ineffective assistance of counsel, instructional error, and error in the restitution award ordered by the trial court.  We affirm the judgment.

## I.  BACKGROUND

Codefendants Veola Gaines and Joey Anderson were charged by information in December 2009 with one count each of committing grand theft by unlawfully taking more than $400 from a Contra Costa County welfare agency.  (Pen. Code, § 487, subd. (a).)[1]

---

[1] The required value for grand theft was raised to $950 effective January 1, 2011, and the increase applied retroactively to cases that were not final before that date.  (See *People v. Wade* (2012) 204 Cal.App.4th 1142, 1152.)

Trial began on May 2, 2012. On May 3, counsel for both defendant Gaines and codefendant Anderson objected on *Batson/Wheeler*[2] grounds to a peremptory challenge exercised by the prosecutor against an African-American prospective juror, Ms. J. After a hearing, the trial court overruled defendant's objection to the challenge.

**A. *Prosecution Case***

Michelle Hasan, director of the leased housing department for the Oakland Housing Authority, testified that low-income county residents can obtain subsidized housing under the federal "Section 8" program. An applicant must submit financial information and certification of Oakland residence. That information must be recertified every year upon renewal of the application.

Recipients of Section 8 assistance must live in the subsidized premises. Defendant applied for Section 8 housing on January 25, 2006. Defendant's address on her application was 2558 Fern Street, Oakland (Alameda County), and she was admitted in October 2006 to a subsidized apartment at 5025 Webster Street, Oakland. Defendant's daughter, Tanzania Anderson, was listed as a co-applicant on the application. Defendant submitted recertification documents in 2007 and 2008. The recertification documents for 2008 showed that a live-in caregiver, Melinda Ponnell, was also staying at the residence. There was no documentation for a caregiver in 2006 or 2007. A letter in defendant's file stated that her request for a live-in aide had been denied because Ponnell did not properly prove a noncriminal background.

Michelle Calabio worked as a social worker for the In-Home Supportive Services (IHSS) division of the Contra Costa County Employment & Human Services Department (EHSD). Calabio explained the county administers a federal in-home assistance program for elderly and moderately disabled county residents (IHSS program). All recipients of IHSS assistance from Contra Costa County must live in the county. Defendant first applied for IHSS assistance in August 2005. The address listed on defendant's

---

[2] See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

application was 2012 Weldon Lane, Bay Point (Contra Costa County). Defendant's application was renewed in July 2006 and March 2007, listing two different addresses in Contra Costa County. Defendant's 2007 application showed Joey Anderson to be her caregiver.

Defendant's IHSS applications were not granted until January 2007, after she was deemed entitled to receive supplemental security income (SSI) and Medi-Cal benefits. As a result of these approvals, defendant and her caregiver became entitled to retroactive compensation for prior in-home care that had qualified under the IHSS program. An IHSS nurse met with defendant at the Bay Point home of her sister in February 2007 to assess her needs for in-home care. The nurse determined defendant was eligible for the maximum amount of care allowed under the program, 260 hours per month.

Time cards submitted to IHSS showed Joey Anderson as defendant's caregiver between April 2007 and February 2008. Requests for retroactive payment were also submitted in the name of Anderson for care he had allegedly provided defendant between August 2005 and April 2007. Time cards were submitted showing Melinda Ponnell as defendant's caregiver between March and August 2008.

In May 2008, Calabio was assigned to evaluate defendant's continuing need for IHSS assistance. At that time, IHSS was paying for defendant to receive 260 hours of in-home care per month. Before meeting with defendant, Calabio sent a letter to defendant at her then-listed address, 3003 Beverly Drive, Bay Point. Calabio visited defendant at that address on May 30, 2008. During the visit, defendant gave Calabio a letter on Kaiser Permanente Medical Group (Kaiser) stationery dated April 2, 2008. The letter was purportedly signed by a Kaiser doctor, Laura Morgan, and it stated that defendant needed more than 260 hours of care per month. Defendant also told Calabio during the visit that her sister, Novella, was her current caregiver. When Calabio returned to her office after the visit, she noticed county records listed Melinda Ponnell as defendant's caregiver. Calabio phoned defendant to ask about the discrepancy, and defendant said her primary caregiver was Ponnell, but her sister Novella also helped from time to time.

Calabio also found the Kaiser letter odd. The name of the doctor who had signed the letter, Laura Morgan, did not appear on the letterhead, and the text of the letter contained several grammatical errors.[3] Suspicious of the letter's authenticity, Calabio referred the matter for internal investigation. On August 6, 2008, defendant called Calabio, informed her she had moved to Alameda County, and asked if her IHSS benefits could be transferred there.

Gayle Goldblatt, custodian of records for Kaiser Permanente East Bay Medical Centers, was asked to examine Kaiser records for evidence of Dr. Morgan's purported letter requesting additional in-home care for defendant. She found no evidence of the letter in the hospital's computer system or paper files, including defendant's medical file, and none of the Kaiser medical secretaries could find any record or copy of it in their data systems. Goldblatt showed the letter to Dr. Morgan and asked if she had written it. Dr. Morgan told her she had not written or signed it, adding that the signature on the letter was an excellent copy of her signature.[4] Dr. Morgan had written other letters on defendant's behalf at other times.

An IHSS payroll supervisor testified Anderson's time sheets began in November 2005 and continued until February 28, 2008. The total amount paid to Anderson for that period was $68,659.48. The total amount paid to Ponnell, for the period from March 2008 to September 2008, was $15,979.85. Defendant's address in the

---

[3] The letter stated in relevant part: "I am one of Ms. Gaines' doctor's whom [*sic*] treat her for current conditions of multiple sclerosis and other related health issues. [¶] I have written a letter February 2007, regarding her need for 24 hour, seven days per week care, at this time the same care apply [*sic*]. My patient, Ms. Gaines, informed me that the reason she is not having appropriate change in clothing, et cetera, to prevent bed sores and vaginal infections, was because she is not having anyone late night to take care of her physical needs. I became very alarmed. [¶] As her doctor, I am concerned that the treatments for bed sores and vaginal infections because of her lying in her own waste for too long will not get better without adequate care. It is necessary for her to have 24 hour care, seven days per week care for her safety because of the many physical, mental and psychological needs she has currently. Sincerely, Laura Morgan, MD."

[4] Defense counsel's failure to object to this hearsay testimony by Goldblatt is one of the issues defendant raises in this appeal.

records was 3003 Beverly Drive, Bay Point.  Ponnell's residence address was shown as 5025 Webster Street in Oakland, defendant's Section 8 residence.

Defendant and Anderson had opened a joint account at the Dow Great Western Credit Union in 1991.  The account had nominal balances (less than $20) in late 2006 and early 2007, but there were a series of large deposits in the spring of 2007.  Each of those deposits contained checks payable to Anderson and drawn in sequential order on the State of California.  The first 11 checks, totaling $26,392.39, were deposited on April 20, 2008.  Two later deposits of checks were made on May 3, 2008 for $8,753.57, and $3,002.04 (reflecting checks totaling $5,002.04 and a simultaneous withdrawal of $2,000 in cash).  On June 21, 2007, $25,000 was withdrawn from the account in three cashier's checks made payable to defendant.  The checks were drawn in the amounts of $9,000, $8,000, and $8,000, and the address listed for defendant on each check was 5025 Webster Street, Oakland.

Defendant's listed address in the credit union records was the Webster Street address in Oakland between April 1, 2007 and June 30, 2007.  Thereafter, the listed address was for a post office box in Martinez (Contra Costa County).  Anderson's name was removed from the credit union account and Tanzania's name was added to the account on August 15, 2007.

James Bergstrom, an investigator for the Contra Costa County District Attorney's Office, interviewed Joey Anderson at his Bay Point residence on January 7, 2009.  An audiotape of the interview was played for the jury, and the related transcript was included in the record.  Anderson told Bergstrom he served as defendant's caregiver from June 2005 until February 2008.  When asked what his relationship was with defendant, Anderson said:  "Ah, just a good friend. [¶] . . . [¶] We work together.  We grew up together."  Anderson did not mention that he and defendant had been married and divorced, or that they were the parents of two children.  Bergstrom asked Anderson about the work he had performed for defendant, and Anderson said that he had known defendant for a long time and that she is very ill.  As a result, Anderson had spent many hours performing household chores for defendant between 2005 and early 2008.

Anderson said he had helped defendant when she needed it most, and it was always at her Contra Costa residence, 3003 Beverly Lane, Bay Point. Bergstrom showed Anderson a photo of Melinda Ponnell, and he did not recognize her.

Defendant's sister-in-law, testified she had lived with her husband, Chester Dodson, at 3003 Beverly Drive in Bay Point for 32 years. Defendant frequently spent time with the Dodsons, and Anderson often spent the night so he could help her. Anderson later stopped helping defendant, and a woman named Melinda Ponnell started coming to the house to help.

## B. *Defense Case*

Defendant testified on her own behalf. She was 55 years old at the time of trial, suffers from multiple sclerosis, and was eligible for certain benefits from the government as a result of being disabled by the disease. Defendant grew up in Contra Costa County and attended St. Mary's College on an athletic scholarship. She married Joey Anderson when she was 19, and they had two children together. They divorced in 1999, and defendant married Darryl Gaines in 2002. Defendant lived with Gaines at his residence on Fern Street in Oakland until the couple separated in 2004.

Defendant earned two business degrees in night school, and later worked at Dow Chemical and the Contra Costa County health and probation departments. She worked with computers in most of her jobs. Defendant started to suffer from a variety of ailments in 1989, when she lost control of her arm. She began to feel weak and numb in 2005. She was diagnosed with multiple sclerosis, and required hospitalization and later rehabilitation. When she was released from rehabilitation, she went to the home of one of her sisters, Debra. She also spent time with her other sisters so she would not be a burden on any one household. Joey Anderson often came to help defendant because she had limited mobility, and defendant's sisters helped her maintain personal hygiene.

Defendant applied for general assistance, food stamps, and Social Security disability in 2005. She learned she was eligible for in-home custodial care, so she applied to Contra Costa County for that type of assistance. She was told she and

6

Anderson could obtain reimbursement for in-home care previously provided by Anderson, so they submitted applications for retroactive compensation.

Anderson continued to help defendant until February 2008. After that, Melinda Ponnell assisted defendant until August 2008. At some point, defendant wanted to reconcile with Darryl Gaines, and she also wanted to live with her daughter, Tanzania, who was attending Mills College in Oakland. Defendant applied for Section 8 housing in Oakland. When a Section 8 apartment became available on Webster Street, Tanzania moved into the apartment, but defendant did not. Instead, defendant continued to spend most of her time with her relatives in Contra Costa County.

Defendant moved to Oakland in March 2008. Melinda Ponnell assisted her in Oakland from March 2008 until August 2008. Defendant eventually dropped out of the IHSS program because she was required to pay a portion of the costs, which were too expensive for her. Defendant spent 15 to 16 months in Oakland, but she also spent much of that time with relatives in Contra Costa County because she had not fully recovered. Defendant inquired about transferring her Section 8 housing subsidy to Contra Costa County, but she could not find a qualifying apartment. Defendant purchased a house in Antioch, using a lump sum payment she had received from Social Security disability.

Defendant's general practitioner for much of this time was Dr. Laura Morgan. To help defendant obtain in-home assistance, Dr. Morgan wrote more than one letter describing defendant's illness and explaining her need for extended home care.

Defendant and Anderson opened an account at the Dow Credit Union while they were married. Defendant never removed Anderson's name from the account, and she and Anderson deposited Anderson's IHSS checks in the account when he received them in April 2008. Defendant later withdrew large amounts of money from the account to pay college expenses for their daughter, Tanzania. Anderson also withdrew some money to pay his personal expenses.

On cross-examination, defendant admitted she had applied for Section 8 housing in Oakland in 2006, and renewed the application in 2007 and 2008, but testified she did this to allow Tanzania to live in the apartment. Defendant said she did not move into the

7

Section 8 housing in Oakland until 2008. Defendant denied creating the fabricated April 2, 2008 letter purportedly from Dr. Morgan, and also denied giving that letter to Michelle Calabio. She acknowledged Michelle Calabio's testimony that defendant had identified her sister, Novella, rather than Melinda Ponnell, as her caregiver in May 2008, but insisted Calabio had lied about this.

Defendant's family members and friends testified she was an outstanding athlete in her youth, a hard worker before her illness, and a strong and honest person.

Codefendant Joey Anderson testified he received a large lump sum payment for retroactive pay in April 2007, and he deposited that money in a joint account he shared with defendant. Anderson wanted the money to benefit their daughter, Tanzania, and he wanted defendant and Tanzania to both have access to it. Anderson ultimately stopped caring for defendant in February 2008 because he believed she was capable of taking care of herself. He was certain he had worked many more hours than the hours for which he received payment.

## C. *Verdicts, Sentencing, and Appeal*

The jury convicted defendant as charged and found codefendant Anderson not guilty. Defendant moved for a new trial based on her trial attorney's failure to object to inadmissible hearsay testimony. The motion was denied. Thereafter, the court suspended imposition of sentence and placed defendant on probation for five years. The trial court ordered defendant to pay restitution of $44,727.33 to EHSD. Defendant timely appealed.

## II. DISCUSSION

Defendant contends trial court errors and ineffective assistance rendered by her trial counsel are sufficiently prejudicial, considered either individually or cumulatively, to require reversal of the judgment in whole or in part. Defendant rests her argument on (1) the trial court's denial of her *Batson/Wheeler* motion; (2) defense counsel's failure to object to Goldblatt's hearsay testimony concerning the April 2, 2008 letter purporting to be from Dr. Morgan; (3) instructional omissions and errors pertaining to defendant's

8

residency; and (4) constitutional and statutory error in determining the amount of the restitution award.

## A. Batson/Wheeler

Defendant maintains the prosecutor's use of a peremptory challenge against Prospective Juror No. 17, Ms. J., violated her Sixth Amendment right to an impartial jury. In her view, the prosecutor's stated, race-neutral justifications for his challenge to this prospective juror were not credible or sincere, and the trial court's finding to the contrary was not supported by substantial evidence. In particular, defendant argues the justifications offered for excusing Ms. J. either did not accurately describe her responses or her responses were far less problematic than those of White prospective jurors who were not challenged by the prosecutor and were sworn in as jurors.

### 1. *The Voir Dire of Ms. J.*

Of the 67 prospective jurors sworn to answer questions, Ms. J. was the only African-American woman who was called for questioning. Ms. J. was single and had been employed for 29 years as a mail processing clerk for the United States Postal Service. She was the mother of two grown children.

When questioned by the court, Ms. J. stated she had served on a jury in a criminal trial 30 years ago in Alameda County, but nothing about that experience affected her ability to be fair and impartial. Her brother was a former Oakland police officer who had left the force about 30 years earlier, but she had never talked with him about his work. Ms. J.'s daughter had been a witness in a motorcycle driving under the influence case and her son had once been accused of shoplifting and manhandled by security guards, but he had filed a lawsuit that was settled fairly. She stated neither child's experience would affect her, and she could be a fair and impartial juror.

After the court concluded its voir dire, the prosecutor was invited to question the 20 prospective jurors. The prosecutor inquired into three areas with each prospective juror: (1) whether the jurors or anyone they had known had received "welfare," or (2) had ever experienced or expressed frustration with the process by which benefits were

obtained, and (3) whether they had feelings of sympathy as a result of experiences related to public benefits.

When he reached Ms. J., the prosecutor first asked her about her brother: "Q. Ms. [J.], you—your brother was an officer in the Oakland Police Department [(OPD)]; is that right? [¶] A. No, he's not. [¶] Q. He's now retired? [¶] A. He's not retired. He left. [¶] Q. How long ago was that? [¶] A. About 30 years ago. [¶] Q. You know, I've never met an officer who didn't like to tell war stories. Did he ever tell you war stories about his experience? [¶] A. No. [¶] Q. Really? Okay."

The prosecutor then asked her about her feelings concerning public benefits: "Q. . . . [¶] You've heard all the questions I've asked the other jurors? [¶] A. I might have a little sympathy. [¶] Q. Might have a little sympathy. How so? Are you able to expand on that to help me understand? [¶] A. Um, not really. I just—I might be leaning kind of toward them just out of—just out of maybe—I don't know, just maybe out of personal experience in having to deal with the system or what have you. [¶] MR. DANG: Thank you very much. I appreciate your honesty. That's what we ask. We want an honest answer from everybody. As the judge says, there's no wrong answer. [¶] Thank you very much."

When defense counsel questioned Ms. J., he asked her whether she would be conscious of her sympathy and still vote according to the evidence. She replied, "I would try to, yes." Counsel asked: "So you would make an effort to set that prejudice—excuse me—that sympathy aside, or prejudice, whatever it is, and you would make it—you would try to vote on the evidence in the case. And if the evidence shows fraud then you would go for that, right?" Ms. J. replied, "Yes, I would."

When counsel for codefendant Anderson began his voir dire, he asked all of the jury candidates to raise their hands if "the term 'welfare' invoke[d] any strong feelings" in them. A few people raised their hands. It appears Ms. J. was one of them because the attorney immediately questioned her as follows: "Q. Now, Ms. [J.], you raised your hand to my previous question. Could you tell us a little bit about what feelings are invoked when you— [¶] A. When I hear the term of welfare, I automatically think of

10

children in some way. . . . [¶] Q. So it's fair to say it's a positive feeling? [¶] A. Yes, it's positive."

Later, when the court asked her whether sympathy would prevent her from finding the defendants guilty if the prosecution proved its case beyond a reasonable doubt, Ms. J. responded, "No."

### 2. *The* **Batson/Wheeler** *Motion*

The prosecutor sought to use his second peremptory challenge against Ms. J., and the two defense attorneys objected on *Batson/Wheeler* grounds. The parties agreed there were a total of three African-Americans in the 67-person venire, and that both defendants were African-American.

Defendant's attorney stated while Ms. J. had "said something about sympathy[,] . . . she indicated she can set that aside." Counsel further pointed out that Ms. J. fit the profile of a good juror for the prosecution because her brother had been a police officer. The prosecutor expressed "personal offense" at the motion and took the position defendant had failed to make out a prima facie case of discrimination.

The court asked the prosecutor: "[I]f I were to find there was a prima facie case, what would you like to address your reasons for exercising this strike?" The prosecutor responded as follows: "Despite her protestations, I believe [Ms. J.] cannot set aside her sympathies. Initially she did say that she would have sympathy for somebody in either one of the—I think maybe the context was Ms. Gaines, but either way—but mainly Ms. Gaines. Not only that, [Ms. J.] had to be rehabilitated. [¶] And so counsel's argument saying that she's a good potential juror because, quote, unquote, she was rehabilitated does not address the issue. I am excusing her because I'm not convinced that she can set aside her sympathy in light of her entire responses to all my questions and both counsels [*sic*] during the voir dire. [¶] Two, she has said that her son was recently accused of a crime. I think she said it was subsequently resolved: So it looks like her son, somebody who's very close to her, in recent time, was accused of [a] crime and let go. My concern and reason for excusing her is that this would influence her as to imposing her experience on what happened to her son on this case. [¶] She said that her brother was a former

11

officer with Oakland Police Department.  I asked, well, he must have retired or how long ago did he retire.  She said, He left.  That tells me that there is a potential that he left OPD under less than good relationships, and that may reflect upon her view of law enforcement generally, especially since one of my investigators is Inspector Bergstrom. [¶] She works for the post office.  It's my—because this involves a public agency, dealing with various rules and administrations—she lists herself as a mail processing clerk.  I am concerned and fear that she will have a hostile view of superiors or rules and regulations to the extent that it would affect her ability to be fair in this particular case." The prosecutor also noted an African-American man remained as a prospective juror.[5]

Defendant's counsel responded as follows:  "[F]irst of all, it's too many reasons. There's a Spanish proverb that says, 'The ten things take away the first.'  When you start giving so many reasons you start to think of the reason.  The last one struck me as very strange that [Ms. J.] works in civil service and therefore she's going to dislike the government. [¶] As far as her brother, that's speculation that—how he left. [¶] And her son, she indicated, was resolved satisfactorily.  She thought he was accused of shoplift and then the police maybe overreacted and it was all settled, you know, without either side prevailing.  That sounds like someone who approved of what happened in the system. [¶] Submitted, your Honor."

The trial court ruled as follows:  "I'm going to deny the *Batson*/*Wheeler*/*Johnson*[6] motion.  I don't believe a prima facie case has been made. [Ms. J.] is African-American but beyond that I don't think there's any ground for a prima facie case.  But even if that were the case, I think that [the prosecutor] has set forth some race neutral reasons that are credible to excuse this juror. [¶] And I will also add that when we had a sidebar conference about challenges for cause, [the prosecutor] wanted to challenge [Ms. J.] for cause because of the sympathy and that's why I went back and

---

[5] The man in question ultimately served on the jury.

[6] *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*).

12

rehabilitated her, but he was concerned about the sympathy issue even at the cause challenge stage. So I'm going to deny the *Batson*/*Wheeler*/*Johnson* motion."

Ms. J. was dismissed.

### 3. *Applicable Law*

" '[A] prosecutor, like any party, may exercise a peremptory challenge against anyone, including members of cognizable groups. All that is prohibited is challenging a person *because* the person is a member of that group.' " (*People v. Jones* (2011) 51 Cal.4th 346, 369.) " 'It is well settled that "[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]" ' [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 447.)

The trial court evaluates a *Batson/Wheeler* motion in a three-step process. (*People v. Silva* (2001) 25 Cal.4th 345, 384.) " '[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.' " (*Ibid.*, quoting *Purkett v. Elem* (1995) 514 U.S. 765, 767.)

The defendant satisfies his or her prima facie burden in step one by producing facts giving rise to an inference of discriminatory purpose. (*Johnson, supra*, 545 U.S. 162, 170.) The determinations required by steps two and three are more complex: "In determining whether the defendant ultimately has carried his burden of proving purposeful racial discrimination, 'the trial court "must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in

13

which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . .' [Citation.]" ' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1100.) Implausible or fantastic justifications may be found to be pretexts for purposeful discrimination. (*Purkett v. Elem*, *supra*, 514 U.S. at p. 768.) Reasons contradicted by the record may be evidence of such discrimination. (*McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1221–1222; *Caldwell v. Maloney* (1st Cir. 1998) 159 F.3d 639, 651.) However, the justification offered need not be sufficient to support a challenge for cause, and even " 'trivial' " or " ' "highly speculative" ' " reasons, if genuine and neutral, will suffice. (*People v. Arias* (1996) 13 Cal.4th 92, 136; *People v. Ervin* (2000) 22 Cal.4th 48, 77.) "The proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.)

" ' "Review of a trial court's denial of a [*Batson/Wheeler*] motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] ' . . . We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' " ' [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 165.)

### 4. *Analysis*

As an initial matter, we agree with defendant this is a "first stage/third stage *Batson* hybrid" in which " 'the question of whether defendant established a prima facie case is moot.' " (*People v. Mills* (2010) 48 Cal.4th 158, 174 (*Mills*).) That situation exists when, as here, the trial court requests the prosecutor's reasons for the peremptory challenges and rules on the ultimate question of intentional discrimination. (*Ibid.*) We express no opinion on whether defense counsel established a prima facie case of

14

discrimination and focus on the third stage of the inquiry—whether the prosecutor's stated race-neutral reasons for challenging Ms. J. were genuine.

As a general matter, a challenge to a single juror who is a member of a cognizable group, standing alone, is the weakest possible evidence of impermissible exclusion. (See *People v. Semien* (2008) 162 Cal.App.4th 701, 708.) There must be significantly more evidence than that to undermine the presumption the challenge was used in a constitutional manner. Here, defendant relies primarily on a comparative analysis of other jurors not challenged by the prosecutor who, according to defendant, gave responses in voir dire nearly identical to or even more problematic than those given by Ms. J. which the prosecutor cited as his justification for challenging her.

The first and principal reason offered by the prosecutor for challenging Ms. J. was her statement that she "might have a little sympathy" or "might be leaning kind of toward" a person receiving public benefits due to her "personal experience in having to deal with the system." The prosecutor stated— based on all of Ms. J.'s responses during voir dire—that he was not convinced she could set aside her sympathy or inclination toward a person receiving benefits. Defendant questions why the prosecutor was not similarly concerned by statements made by Prospective Jurors Nos. 4, 15, and 25, who were White.

Prospective Juror No. 4 indicated he knew persons who had received various different types of public benefits, and that he "[p]ersonally" had felt frustration with "the process" or "the system." The prosecutor had then asked Prospective Juror No. 4: "Some people get so frustrated with the system, whether it's DMV, unemployment, something like that. They are just—it creates an emotion that's hostile to that agency or any agency; you think you can overcome that?" Prospective Juror No. 4 responded, "Yes." During voir dire by counsel for codefendant, Prospective Juror No. 4 raised his hand when counsel asked if anyone felt strongly about accepting welfare, and explained he had worked all his life and would consider it a failure to accept welfare.

Prospective Juror No. 15, a construction worker, had received unemployment benefits at times when there was no work available, currently had a sister on SSI, and had

15

a mother-in-law receiving physical assistance in some type of facility. The prosecutor did not ask Prospective Juror No. 15 about any of these matters and allowed him to be sworn to serve on the jury. Prospective Juror No. 25 also had a sibling who received SSI benefits for which Prospective Juror No. 25 was the payee, and disclosed his wife was a caregiver for the elderly and enjoyed her work. The prosecutor did elicit from Prospective Juror No. 25 on voir dire that his wife had not made any comment when he told her the type of case on which he might be a juror, he did not know whether her company received any public money, and he thought he could be a fair juror. Prospective Juror No. 25 also wound up serving on the jury.

According to defendant, the "sympathies and emotions" exhibited by Prospective Jurors Nos. 4, 15, and 25 were "more troubling than anything said by Ms. [J.]," expose a double standard by the prosecutor, and call into question whether the trial court " ' "ma[de] a sincere and reasoned effort to evaluate the nondiscriminatory justifications" ' " he offered for challenging her. (*Mills*, *supra*, 48 Cal.4th at p. 175, italics omitted.) We disagree.

Prospective Juror No. 4 openly acknowledged having *negative* feelings about welfare. Prospective Jurors Nos. 15 and 25 merely stated they had relatives receiving public benefits or, in Prospective Juror No. 15's case, that he had received unemployment benefits at times. But Prospective Juror No. 15 also indicated reluctance to accept public benefits, making a point of saying he had declined to take benefits at times when he would have been entitled to them. Although Prospective Juror No. 25 had a brother receiving SSI, he never expressed any feelings toward his brother, the welfare system as a whole, or people on welfare. Most importantly, none of these jurors indicated they would be sympathetic toward or might lean in favor of a person who was receiving public benefits, as Ms. J. had. We are simply not persuaded by defendant's comparative juror analysis that the prosecutor's stated concern about Ms. J.'s sympathies and emotions toward public benefits recipients was insincere. As the trial court pointed out, the prosecutor's sincerity was underscored by the fact that he initially wanted to have Ms. J. excused for cause based on this factor.

16

Defendant also fails to persuade us the prosecutor's other proffered reasons were insincere, particularly when the four factors he mentioned are viewed in combination. The fact Ms. J.'s son had been falsely accused of shoplifting, mistreated by security guards, and brought suit over the incident is an obvious red flag to a prosecutor. Such an incident created a risk Ms. J. would view law enforcement testimony with greater skepticism than other jurors, and could hold the prosecution to a higher standard of proof, even if the police were not involved. The prosecutor's belief the incident had occurred recently and his reference to her son as "somebody who's very close to her" may have been mistaken or unsupported assumptions, but they do not constitute probative evidence of insincerity. Defendant mentions the prosecutor's failure to express concerns about three other prospective jurors who were, respectively, the victim of an assault (Prospective Juror No. 15), a child of the victim of an attempted kidnapping that occurred when the juror was five years old (Prospective Juror No. 5), and a friend of two persons who had justly been convicted of drug crimes in the county (Prospective Juror No. 4). But none of these experiences is comparable to Ms. J.'s experience of having her son be unjustly accused of a crime. Prospective Juror No. 5's experience occurred when she was five years old, and Prospective Juror No. 15's assault occurred 30 years previously. In any event, a prospective juror's status as a crime victim or close relative of a victim would make the juror *more* rather than less appealing to the prosecution, other things being equal. Prospective Juror No. 4's friendship with persons prosecuted for drug crimes might otherwise have made him seem problematic for the prosecution. But the additional fact, which he volunteered, that he believed his friends were *properly* found guilty of those offenses would more than neutralize that concern. None of these juror experiences poses a risk for the prosecution comparable to Ms. J.'s experience of her son being falsely accused of a crime.

The two other concerns articulated by the prosecutor—that Ms. J.'s brother might have left OPD with negative feelings about it, and that she might have a hostile view of public agency rules and regulations as a result of her job as a postal service mail processing clerk—were obviously of a more speculative nature. That does not mean they

17

were fabricated. Jury selection inevitably involves some element of guesswork and speculation. As long as the reasons offered are genuine, "[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*People v. Lenix* (2008) 44 Cal.4th 602, 613.) The fact the prosecutor had followed up with Ms. J. about her brother's former employment with OPD, and tried to elicit information about "war stories" he might have told her underlined that he was concerned whether her brother's law enforcement experience was positive or negative. The genuineness of the prosecutor's stated concern about Ms. J.'s attitude toward public agency regulations was shown by the fact he questioned another prospective juror (Prospective Juror No. 22), a California Department of Transportation (Caltrans) road crew worker, about that juror's possible frustration with Caltrans regulations. Just because he was ultimately satisfied by Prospective Juror No. 22's answers does not mean the prosecutor's concern was fabricated in Ms. J.'s case, particularly when viewed in combination with the other issues presented by her responses.

We find substantial evidence in the record supports the trial court's conclusion that the prosecutor's stated reasons for challenging Ms. J. were genuine and not pretexts for discrimination.

## B. *Ineffective Assistance of Counsel*

Defendant's trial attorney did not object when Kaiser's custodian of records, Gayle Goldblatt, testified that defendant's doctor at Kaiser told her she did not write or sign the suspicious April 2, 2008 letter defendant gave to her social worker recommending defendant receive daily 24-hour home care. The prosecution later argued to the jury that defendant's asserted forgery of this letter was evidence of her intent to deceive. Defendant maintains trial counsel's failure to object to Goldblatt's hearsay testimony on this point constituted ineffective assistance of counsel. In a points and

authorities submitted by defendant's counsel in support of her postverdict motion for a new trial, counsel stated he should have objected, but was "distracted."[7]

To sustain a claim of ineffective assistance of counsel, defendant must demonstrate counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that counsel's deficient performance affected the trial's outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688; *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.)

Here, we find no reasonable possibility the hearsay testimony in issue affected the trial's outcome.  Other undisputed evidence established the letter had been forged.  It was not reasonable to believe the egregious grammatical errors found in the letter could have been made by a medical doctor.  The doctor's name was not printed on the letterhead.  There was no record of the letter in Kaiser's computer system or paper files even though Kaiser maintained a data and record system covering all such correspondence.  In any event, had defendant objected to Goldblatt's hearsay testimony, the prosecution could have simply called Dr. Morgan to testify she did not write the letter.[8]  Furthermore, there was sufficient other evidence of defendant's intention to deceive—including evidence defendant falsified her residence, signed false time cards, exaggerated her care needs, and withdrew money IHSS had paid to her ex-husband ostensibly to provide home care services to her—that there is no reasonable likelihood Goldblatt's hearsay testimony affected the jury's finding on this issue.

Assuming without deciding that trial counsel's failure to object to Goldblatt's hearsay statements breached professional norms, defendant fails to establish she was prejudiced by the breach.

---

[7] Trial counsel filed no accompanying declaration to that effect.

[8] We infer Dr. Morgan would have confirmed the statement given that defendant at one pointed indicated she intended to call Dr. Morgan but then rested her case without doing so.

## C. *Instructional Error*

Defendant contends the trial court had a sua sponte duty to instruct the jury with the first sentence of Welfare and Institutions Code section 11102: "County residence is not a qualification for aid under any public assistance program." According to defendant, this "black-letter legal principle was closely and openly connected to the case" because it cast doubt on the fundamental validity of the prosecution's position and supported the defense position that she had no intent to deceive when she failed to disclose her Alameda County residence. (See *People v. St. Martin* (1970) 1 Cal.3d 524, 531 [trial court has sua sponte duty to instruct on general principles of law closely and openly connected with the facts before the court and which are necessary for the jury's understanding of the case].)

Viewed in its full statutory context, the one sentence defendant focuses on in Welfare and Institutions Code section 11102 is not in fact relevant to the offense with which she was charged nor necessary for the jury's understanding of the case. The IHSS program is one of a number of social service programs funded by the state or federal government that are administered by counties. (See Welf. & Inst. Code, § 10800.) Welfare and Institutions Code section 11102 provides in relevant part: "County residence is not a qualification for aid under any public assistance program. [¶] County responsibility for making aid payments is determined as follows: [¶] (a) The county where the applicant lives shall accept the application and shall be responsible for paying the aid. [¶] (b) Responsibility for payment of aid to any person qualifying for and receiving aid from any county, who moves to another county in this state to make his home, shall be transferred to the second county as soon as administratively possible, but not later than the first day of the month following 30 days after notification to the second county. . . ." The term "public assistance" is defined to include all public social services programs provided for in part 3 of division 9 of the Welfare and Institutions Code, which includes the IHSS program. (See Welf. & Inst. Code, §§ 10061, 12300 et seq.)

In other words, under the statutory scheme, a person otherwise qualified is entitled to public assistance funded by state and federal sources, including IHSS aid, regardless of

20

his or her residence in a particular county. But that does not mean a person is free to falsely claim residence in and receive assistance from any county he or she chooses. As Welfare and Institutions Code section 11102 makes clear, county agencies are obliged to pay aid only to their residents, absent special circumstances. (See also Welf. & Inst. Code, § 11050 [applications for public social services or assistance must be made to the county department in the county in which the applicant is living].)[9] In fact, the statute contemplates a county's responsibility to pay benefits requires not only the recipient's physical presence in the county but an intent to "make [her] home" in the county. (Welf. & Inst. Code, § 11102, subd. (b).) Thus, notwithstanding the first sentence of section 11102, the county of defendant's residence was a material fact affecting her entitlement to IHSS benefits issued by Contra Costa County. We therefore reject the notion the court had a sua sponte duty to instruct the jury with the first sentence of section 11102.

Defendant also challenges the following instruction given to the jury on the concept of residence for purposes of the IHSS program: "A person, in order to be entitled to aid, shall be a resident of the state and of the county wherein application is made. [¶] The residence is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he returns in seasons of repose. [¶] There can only be one residence. [¶] A residence cannot be lost until another is gained. [¶] The residence can be changed only by the union of act and intent."

The foregoing instruction was agreed to in an off-the-record discussion between court and counsel. The first sentence of the instruction came from Welfare and

---

[9] To avoid benefit delays for state residents, Medi-Cal policies provide that if a person applies in the wrong county, the county agency may process the application as a courtesy, make the initial eligibility determination, and issue benefits for a limited period of time until the matter can be transferred to the "County of Responsibility." (Medi-Cal Eligibility Procedures Manual, art. 3, § 3C.) This procedure contemplates that cases will be transferred expeditiously to the correct county based on the facts concerning where the applicant "lives and maintains a home." (*Ibid.*; see also Cal. Code Regs., tit. 22, § 50135.)

Institutions Code section 17100, and the rest from section 244 of the Government Code.[10] As defendant points out, Welfare and Institutions Code sections 17100 and 17101 apply to county general assistance funds authorized under part 5 of division 9 of the Welfare and Institutions Code, and do not by their terms apply to state and federally funded public assistance programs such as IHSS, which are governed under part 3 of division 9. (See 51 Cal.Jur.3d (2014) Public Aid and Welfare, § 48.) However, although defendant's trial counsel had an opportunity to place any objection he had to the instruction on the record, he made no objection. On appeal, defendant now contends the court should have used a residence definition found in California Code of Regulations, title 22, section 50087 (Regulation 50087), which is part of the state's Medi-Cal regulations: "[T]he place in which a person . . . lives or is physically present if the person . . . has no present intention of leaving." According to defendant, Regulation 50087 should govern IHSS benefits because Medi-Cal eligibility was a prerequisite for the IHSS program when she applied.

We are not persuaded. First, defendant failed to preserve her objection to the residence instruction given by timely objecting to it or proposing an alternative instruction in the trial court. Second, while defendant's fallback position is that her trial counsel thereby rendered ineffective assistance, it is still her burden on this appeal to demonstrate there is another residency definition applicable to the facts of this case under which she would have obtained a more favorable result. In our view, defendant fails to carry that burden. The regulation she cites consists solely of a stand-alone definition. There is no indication how that definition is used for processing Medi-Cal applications, much less that it applied to the determination of defendant's eligibility for IHSS benefits in Contra Costa County. For example, the Medi-Cal regulations contain a series of provisions for deciding the "county of responsibility" for determining Medi-Cal eligibility for persons qualifying under different programs. (See Cal. Code Regs., tit. 22, § 50120 et seq.) Some of those provisions do use the term "residence," but only in the

---

[10] The language in the second sentence of the instruction is found in Welfare and Institutions Code section 17101, as well as Government Code section 244.

22

sense of the actual physical dwelling in which an applicant lives. (See *id*., § 50126(a)(1).) According to the testimony at trial, defendant became eligible for Medi-Cal as a recipient of SSI. The applicable Medi-Cal "county of responsibility" regulation, California Code of Regulations, title 22, section 50121 (Regulation 50121), provides that the "county of responsibility" for "persons eligible under AFDC [(Aid to Families with Dependent Children)] or SSI/SSP [(State Supplementary Payment)] shall be established in accordance with the regulations of the applicable public assistance program." Regulation 50121 does not mention or use the term "residence," as defined in Regulation 50087. The Medi-Cal Eligibility Procedures Manual states the "County of Responsibility" is "the county where the [applicant] lives and maintains a home." (Medi-Cal Eligibility Procedures Manual, art. 3, § 3C.) As discussed, defendant did not maintain a home in Contra Costa County.

Since the purpose of the IHSS program is to "permit persons with disabilities to live safely *in their own homes*" (*Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 610, italics added), we will not simply presume an instruction based on the general residency language of Government Code section 244, which was given without objection, imposed too exacting a standard of residence for that program. Defendant must affirmatively demonstrate there is another residency regulation or policy applicable to the IHSS program under which it would have been immaterial to Contra Costa County that she in fact had no home in that county but was, assertedly, moving back and forth among different siblings' houses there while at the same time certifying for Section 8 purposes that she lived in a residence in Alameda County. She fails to carry that burden.

**D.** *Restitution*

The county requested restitution of $78,877.70, based on testimony by the county payroll supervisor that the county had made net payments to Anderson and Ponnell in that total amount. The trial court ordered restitution in the amount of $44,727.33, equal to half the amount the county had paid to Anderson plus the full amount paid to Ponnell. On appeal, defendant contends (1) the restitution award was unconstitutional to the extent it was based on factual findings not implicit in the jury's verdict, and (2) the award

exceeded the trial court's statutory authority because it exceeded the cost to the county of her benefits.

### 1. *Constitutionality of Award*

Defendant maintains any restitution award in excess of the $950 statutory minimum taking required for grand theft violates *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), as construed by *Southern Union Co. v. United States* (2012) 567 U.S. ___ [132 S.Ct. 2344] (*Southern Union*). *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (530 U.S. at p. 490.) *Southern Union* extended this principle to a criminal fine of $38.1 million imposed for environmental violations calculated on the basis that the defendant company had incurred a statutory $50,000 fine each day for 762 days. (*Id.* at p. ____ [132 S.Ct. at p. 2349].) The Supreme Court reversed the fine, finding that since the jury's guilty verdict in *Southern Union* could have been based on only a one-day violation under the instructions, the maximum fine supported by the jury's verdict was $50,000 and the trial court committed *Apprendi* error by engaging in judicial factfinding that enlarged the defendant's punishment beyond what the verdict authorized. (*Southern Union*, at p. ____ [132 S.Ct. at pp. 2349–2357].) According to defendant, the reasoning and holding of *Southern Union* are directly applicable to this case.

As defendant acknowledges, her argument has been addressed and rejected by other appellate courts of this state. *People v. Pangan* (2013) 213 Cal.App.4th 574 states: "[N]either *Southern Union* [nor] *Apprendi* . . . have any application to direct victim restitution, because direct victim restitution is not a criminal penalty. As explained in *U.S. v. Behrman* (7th Cir. 2000) 235 F.3d 1049, 1054, direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased 'punishment.' The *Millard* decision makes the same point in regard to California law. ([*People v.*] *Millard* [(2009)] 175 Cal.App.4th [7,] 35; accord, *People v. Harvest* (2000) 84 Cal.App.4th 641, 645, 650.) *Chappelone* has collected the numerous federal cases also holding victim restitution does not constitute increased

punishment for crime. (See [*People v.*] *Chappelone* [(2010)] 183 Cal.App.4th [1159,] 1184.) And we would note the restitution statute itself characterizes victim restitution awards as civil. (See Pen. Code, § 1202.4, subd. (a)(3)(B) [victim restitution 'shall be enforceable as if the order were a civil judgment'].)" (*Id.* at p. 585, italics omitted.)

We agree with the reasoning and results of the restitution cases cited. We also reject defendant's argument that because the restitution amount assertedly exceeded the county's actual dollar loss, the award is not restitutionary, but amounts to a fine in favor of the county equivalent for all practical purposes to that imposed in *Southern Union.* If the award exceeded the amount authorized by Penal Code section 1202.4, defendant is entitled to a modification or redetermination of the award to the authorized amount. (See, e.g., *People v. Garcia* (2011) 194 Cal.App.4th 612, 621–622.) It does not entitle her to an automatic reduction of the award to the statutory minimum of $950. As discussed in the next section, the award made was within the trial court's discretion.

### 2. *Amount of the Award*

Defendant asserts that because she qualified for IHSS assistance and "the state and federal portions of her benefits would have been paid out [to her] even if those benefits had been paid out by Alameda County," the only actual loss suffered by any government agency was Contra Costa County's share of her benefits, which was less than a third of the restitution amount awarded. In effect, defendant asks us to assume, given the acquittal of codefendant Anderson, that defendant was actually qualified for the full amount of the benefits she received and was guilty only of fraudulently obtaining her benefits from the wrong county. Defendant places reliance on the trial court's comment that "there was some amount that would have been paid out in any event," offered in the course of explaining why the court was deducting half of the amount paid to Anderson from the restitution award.[11] Viewed in context, the court was merely giving defendant

---

[11] The court stated: "I think that . . . I would have been within my discretion to award [the full amount of the benefits paid], but I think, given that—had she not sought the Section Eight in [Alameda County], she could have gotten some, at least, of what she got here, this is appropriate."

25

the benefit of the doubt by not imposing the full amount of the benefits she obtained by fraud.

The standard of review for a restitution order is abuse of discretion. (*People v. Mearns* (2002) 97 Cal.App.4th 493, 498.) "While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 992.) "No abuse of discretion will be found when there is a factual or rational basis for the amount of restitution ordered." (*People v. Hudson* (2003) 113 Cal.App.4th 924, 927 (*Hudson*).)

We decline to speculate about whether defendant might have qualified in Alameda County for the same level of benefits she fraudulently obtained from Contra Costa County. The trial court made no finding that she would have. What the record shows is that (1) Contra Costa County administered the IHSS program, (2) the county initiated and approved all of the benefit payments made on defendant's behalf, (3) none of the payments would have been approved had the county been aware of defendant's Section 8 certifications of residence in Alameda County, and (4) the county was the direct victim of defendant's fraud. That is sufficient to support the award. (Pen. Code § 1202.4, subds. (f), (k)(2).)

*People v. Crow* (1993) 6 Cal.4th 952, cited by defendant, does not require a different result. *Crow* holds amounts a government agency would have been obligated to pay had the fraud not occurred are not a " 'loss' arising out of the criminal offense." (*Id.* at p. 962.) Here, Contra Costa County would not have approved any payments to defendant but for her fraud, which included not only deception about her residence, but also about her need for the services, whether the services were actually rendered, and the destination of the funds paid on her behalf.

We find there was a factual and rational basis for the award, and the trial court did not abuse its discretion in making it. (*Hudson, supra,* 113 Cal.App.4th at p. 927.)

26

### 3. *Cumulative Error*

Defendant contends the cumulative effect of the errors alleged rendered her trial fundamentally unfair in violation of the due process clause, and requires reversal of the judgment or, failing that, of the restitution order. We have found no trial court error. To the extent we have assumed deficient performance by trial counsel in failing to object to witness Goldblatt's hearsay testimony or to the residence instruction given, no prejudice was demonstrated in either instance. We therefore reject defendant's claim of cumulative error.

## III.  DISPOSITION

The judgment is affirmed.


_____
Margulies, Acting P.J.


We concur:


_____
Dondero, J.


_____
Banke, J.


27